```
1               IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2
                     FORT LAUDERDALE DIVISION
3
                   CASE NO.:  21-cr-60067-AHS
4

5

6

7  UNITED STATES OF AMERICA,     )
                                 )
8           Plaintiff,           )
   v.                            )
9                                )          March 10, 2021
    PAUL NICHOLAS MILLER,        )
10                               )          Pages 1 - 88
            Defendant.           )
11  _____/

12

13

14
                        DETENTION HEARING
15
          BEFORE THE HONORABLE PATRICK M. HUNT
16             UNITED STATES MAGISTRATE JUDGE

17

18

19

20
   APPEARANCES:
21

22  On behalf of the Plaintiff:

23                      UNITED STATES ATTORNEY'S OFFICE
                        99 N.E. 4th Street
24                      Miami, FL 33132
                        BY:  KIRAN N. BHAT, AUSA
25
```

APPEARANCES CONTINUED:

On behalf of the Defendant:

                    LAW OFFICE OF RUSSELL L. CORMICAN
                    12 SE 7th Street
                    Suite 700,
                    Fort Lauderdale, FL 33301
                    BY: RUSSELL L. CORMICAN, JR. ESQ.




                    National Organization for Reform.
                    Marijuana Law (NORML)
                    Legal Committee
                    709 SE 7th Street
                    Suite 709,
                    Fort Lauderdale, FL 33301
                    BY:  NORMAN E. KENT, ESQ.




Transcribed by:

                    BONNIE JOY LEWIS, R.P.R.
                    7001 SW 13 Street
                    Pembroke Pines, FL  33023
                    954-985-8875
                    caselawrptg@gmail.com

I N D E X


<u>THE WITNESS</u>:                                          <u>PAGE</u>:

**FBI SPECIAL AGENT COLLIN GREGORY**


Cross Examination by Mr. Cormican:            38

Redirect Examination by Mr. Bhat:             52

Recross Examination by Mr. Cormican:          56

```
 1                    (Thereupon, the following proceeding was held:)
 2            THE COURTROOM DEPUTY:  Calling United States of
 3   America versus Paul Miller; Case Number 21-cr-60067-AHS.
 4            Counsel, please announce your appearances for the
 5   record starting with the Government.
 6            MR. BHAT:  Good afternoon, Your Honor.  Kiran Bhat for
 7   the United States.
 8            THE COURT:  Good afternoon.
 9            MR. CORMICAN:  Russell Cormican, counsel for Paul
10   Miller.  My partner, Norm Kent, is also present.  He is counsel
11   as well.
12            THE COURT:  Good afternoon.  And is that a temporary
13   or a permanent?
14            MR. CORMICAN:  That's a temporary appearance, Your
15   Honor.  I believe Mr. Kent is muted still.  I believe he was
16   just trying to say something.
17            MR. KENT:  Your Honor --
18            THE COURT:  I can't hear you, Mr. Kent.
19            There is a problem with your microphone, Mr. Kent, or
20   with your volume.  We can't hear you, or at least I can't.
21            Mr. Miller, can you hear me?
22            THE DEFENDANT:  Yes.  Yes, Your Honor.
23            THE COURT:  All right.  So, Mr. Cormican, who is going
24   to be primarily conducting the hearing, you or Mr. Kent?
25            MR. CORMICAN:  I believe that I will be doing it
```

1  primarily.  Especially since it doesn't appear that Mr. Kent's
2  microphone is working very good.
3      THE COURT:  For years judges have been trying to mute
4  Mr. Kent and now it's happening without us even trying.
5      MR. KENT:  Can I be heard now at least?
6      THE COURT:  Yes, I can hear you now.
7      MR. KENT:  You know, I just wanted to say that --
8      THE COURT:  You're breaking in and out, Mr. Kent.
9      MR. KENT:  We have a limited notice of appearance for
10  purposes --
11      THE COURT:  We're only hearing less than half of it.
12      MR. CORMICAN:  I think what he's trying to say is we
13  filed a temporary notice of appearance.
14      It appears, at this point, that our representation
15  will not continue beyond that.  I don't think that we will be
16  filing a permanent notice in the case, but we are counsel for
17  purposes of the hearing today and we are ready to proceed.
18      THE COURT:  Well, all right.
19      Are you saying that after the hearing today, you want
20  to give you more time to try to make arrangements, or you're
21  just sort of taking care of the hearing and then he's going to
22  be counsel appointed, or hire someone new, or what?
23      MR. CORMICAN:  It is my understanding that someone new
24  is going to be hired, but has not yet filed a notice of
25  permanent appearance in the case.

1        THE COURT:  But do you want to go forward with the

2  detention hearing or do you want to put it off and let the new

3  lawyer do it?

4        MR. CORMICAN:  No, we would like to go forward.

5        THE COURT:  All right.  I guess it is more than

6  housekeeping.

7        Mr. Miller, you've been charged with another offense

8  and I have to do the initial appearance on that for you today.

9        Mr. Cormican and Mr. Kent, are you going to be

10 representing him on that in any respect?

11       MR. KENT:  No, Your Honor.

12       We are (inaudible) and we have advised the Government

13 of that and that's why we said we're duty bound and obligated

14 as I said (inaudible) and I'm prepare to do that at the Court's

15 direction.

16       THE COURT:  I'm going to have to ask -- unless you can

17 fix the problem, Mr. Kent, I'm going to have to ask Mr.

18 Cormican to speak for the both of you because I only heard

19 about a third of that.

20       Mr. Cormican?

21       MR. CORMICAN:  I'm sorry, Judge.  The question was are

22 we proceeding on the new matter as well?

23       THE COURT:  Well, I would like to do the initial

24 appearance today and I assumed that you would be entering an

25 appearance as well.  And that's going to be something that I'm

1  going to consider during the detention hearing and if none of

2  that is true, I need to know about that.

3        MR. CORMICAN:  Can I have a moment to confer with

4  Mr. Kent?  I can call him up.  If we could just --

5        THE COURT:  Yes, if you need to talk to Mr. Miller

6  also, I could try to put you in a room like I did earlier with

7  Mr. Wilcox.

8        MR. CORMICAN:  I just don't know if that's going to

9  work for Mr. Kent because he is appearing to have technical

10  problems here.

11        THE COURT:  Well, do you need to talk to Mr. Kent or

12  do you need to talk to both of them?

13        MR. CORMICAN:  Mainly Mr. Kent.

14        THE COURT:  Because I could put you all in a room and

15  then you could do the phone call with Mr. Kent.

16        MR. CORMICAN:  Okay.

17        THE COURT:  But if you just need to make a phone call

18  with Mr. Kent, you could put yourselves on mute and make the

19  phone call, but if you need to include Mr. Miller, I think I

20  can manage that.

21        MR. CORMICAN:  I think it would be easiest to just put

22  us on mute and I can call Mr. Kent.

23        THE COURT:  Okay.  We'll be on hold for a minute,

24  then.  All right.  You're both muted.

25        Mr. Bhat, have you received any contact from any other

 1   attorney?

 2          MR. BHAT:  I have not, Your Honor.

 3          I have been advised by Mr. Cormican and Mr. Kent that

 4   an individual by the name of, I think, Mark Costello is the

 5   attorney in question that might be filing a permanent

 6   appearance, but I have not heard from that individual and I

 7   have not seen anything come across the docket either.

 8          MR. CORMICAN:  That's correct, Your Honor.

 9          I was contacted by another attorney named Mark

10   Costello who indicated that he has been retained to represent

11   Mr. Miller permanently and intends to do so, but was not going

12   to file an appearance until after today's hearing.  That is

13   what was relayed to me.

14          THE COURT:  I am going to ask Mr. Miller because it is

15   kind of your call, Mr. Miller.  Here's what's going on.

16          You have already been charged by way of indictment

17   that you already know about and you've made an initial

18   appearance on that.  And I guess last week Mr. Cormican and

19   Mr. Kent indicated that they were coming in at least on a

20   temporary basis asked to move the hearing to this week, but

21   circumstances have changed.

22          And by that, we are about to do an initial appearance

23   on a new complaint that was filed last night.  Essentially,

24   charging with a firearm and ammunition that were in your

25   premises at the time of the arrest.  So that is going to be a

1  new federal charge.

2       It ultimately might be merged into the other one  in

3  one indictment or it might be two separate charges, but that's

4  something that anyone who is representing you needs to know

5  about.  And the Government is asking for a pretrial detention

6  on that charge as well.

7       Right, Mr. Bhat?

8       MR. BHAT:  That is correct.  Yes, Your Honor.

9       THE COURT:  And so when I make a decision on pretrial

10 detention, it is going to include both the existing charge and

11 the new one you are making an appearance on today.

12      If you want Mr. Cormican and Mr. Kent to go forward

13 with the hearing today, that's fine.  If you want to give them

14 time to digest the new charges if that's necessary and you need

15 more time, then ask for it.

16      If you are hiring somebody as permanent counsel that

17 you want to represent you throughout the case and you would

18 rather have that lawyer handle these detention hearings, then

19 that's fine too and you could ask me for that.

20      But what is it that you want to do, Mr. Miller?

21      THE DEFENDANT:  Well, Your Honor, I'm not exactly sure

22 what my family is doing and what financial resources they have

23 at the moment to hire who.

24      The other lawyer you mentioned, I haven't spoke with

25 him about that at all.  I guess we're already here.  So I

```
 1   suppose -- yeah, I mean, we can go forward with it today and I
 2   guess afterwards I'll try to talk to my family and see what the
 3   situation is.
 4         THE COURT:  That's fine, but you should understand
 5   that you only get one shot.
 6         And so if we go forward today, we are going forward
 7   with both charges.  And if I detain you today, you don't get to
 8   get a mulligan and come in next week and say now that I have a
 9   new lawyer, I want another hearing.
10         So if you want a different lawyer to handle it, or if
11   you want these lawyers to have more time to digest what I
12   signed last night, then say so.  I mean, there are time limits,
13   but the time limits can be waived.
14         What's important is, you know, your interests more
15   than anything else.  So if you want to forward today, I'm
16   ready.  If you want more time, then tell me.  And if you need
17   to talk privately with Mr. Kent and Mr. Cormican, then tell me
18   that.
19         THE DEFENDANT:  May I speak with them privately?
20         THE COURT:  You want to do that, Mr. Cormican?
21         MR. CORMICAN:  That's fine if that's what he's
22   requesting, yes.
23         THE COURT:  Let's do that.
24         THE DEFENDANT:  I'm just a little confused, Your
25   Honor.  That's all.  I'm just trying to make sure I understand.
```

1          THE COURT:  Here's the thing.

2          Before we do anything on the existing case, I'm going

3   to do an initial appearance on the new one.  And you have a

4   right to a lawyer to represent you on this case and it may be

5   these lawyers that are here today.

6          It may be Mr. Costello, or it may be someone else or

7   it may be a public defender if you ask for that.  But because

8   these are new charges and you may not have had a chance to

9   really discuss that with Mr. Kent and Mr. Cormican, let me put

10  you in a breakout room to discuss it and, then, let me know

11  what you want; okay?

12         THE DEFENDANT:  Okay.

13         THE COURT:  All right.  So I'm going to try this

14  again.  Mr. Cormican and Mr. Kent, whenever you are finished,

15  you can move freely.  So just come into the new room and, you

16  know --

17         MR. KENT:  Anybody have any suggestions on how to fix

18  this microphone?

19         MR. CORMICAN:  Mr. Kent, you can buy one of these on

20  Amazon for $15.  They're ugly, but they work.

21         MR. KENT:  I do my radio show every day from here.  I

22  can't believe this is happening.  I'll just have to figure it

23  out.

24         THE COURT:  All right.  I'm moving you all to a

25  breakout room right now.

1          MR. CORMICAN:  Thank you.

2          MR. BHAT:  Your Honor, it would appear that Mr. Kent

3  is still in this room.

4          THE COURT:  Yeah, the --

5  (Music).

6          THE COURT:  -- you should be there, but you're not

7  joined.  I don't know if there's something that you need to do,

8  Mr. Kent.  There you go.  He's gone.

9          THE COURTROOM DEPUTY:  Smooth jazz.

10          THE COURT:  I didn't know we had hold music.

11  (Breakout room)

12          THE COURT:  Troy, do you know Mark Costello?

13          THE COURTROOM DEPUTY:  Your Honor, I've heard the

14  name, but I don't know him too well.

15          THE COURT:  And Mr. Bhat, you said you haven't heard

16  from him, but what you just heard from Mr. Kent and Mr.

17  Cormican?

18          MR. BHAT:  That's right.

19          Mr. Cormican called me this morning and told me that

20  he had been contacted by an attorney named Mark Costello.

21  That's all I know.  I have not heard from Mr. Costello myself.

22          THE COURT:  Okay.  If Mr. Miller doesn't want to

23  forward with the hearing today, I'm going to do the initial

24  anyway and give him time to hire counsel for both cases.

25          MR. BHAT:  Understood.

1  (Off the record.)

2          THE COURT:  Elias, it looks like Mr. Cormican came

3  out.

4          MR. CORMICAN:  Is everybody back here with us or --

5          THE COURT:  No.  Do you want me to bring everybody in

6  or did Troy accidently bump you out?

7          MR. CORMICAN:  Troy came in right after we were

8  finishing.

9          THE COURT:  All right.

10         MR. CORMICAN:  We've spoken to Mr. Miller.

11         MR. BHAT:  Your Honor, Mr. Miller is not present.

12         THE COURT:  Let me close the room to get everybody

13  back in.

14         THE COURTROOM DEPUTY:  Judge, we just closed the room.

15  Okay.  Everybody should be back now, Your Honor.

16         MR. BHAT:  Is Mr. Kent back in?  Okay.

17         MR. CORMICAN:  He fixed his microphone as well.

18         THE COURTROOM DEPUTY:  He's back.

19         THE COURT:  So all of the room should be closed and no

20  one is in there and that's done.

21         All right.  Mr. Cormican, what are we doing?

22         MR. CORMICAN:  We've spoken to Mr. Miller.  He would

23  like us to proceed with the pretrial detention hearing on his

24  behalf today.

25         THE COURT:  All right.  And I still think it is

```
 1  probably a good idea to do the initial first.  It should be
 2  quick.  We'll do the -- and then we'll --
 3            MR. CORMICAN:  Judge, by doing the initial first, we
 4  are not in any way obligated to those counts to be his counsel,
 5  right?
 6            THE COURT:  You aren't, but if you are going forward
 7  with the detention hearing today, it's going to be a hearing on
 8  both.  And I could consider that something that they hadn't
 9  filed and charged, but that's why I wanted you to talk to Mr.
10  Miller to see if that's what he wants.  Yeah, we're doing one
11  hearing.
12            MR. BHAT:  And Your Honor, if I may?
13            The Government would be amenable to doing a
14  preliminary hearing in parallel to the detention hearing just
15  for efficiency purposes because it is going to be effectively a
16  very similar hearing down the line if the complaint gets set up
17  for a preliminary hearing in 14 days.
18            So the Government would request that the preliminary
19  hearing be held in parallel with the detention hearing if the
20  Court is considering detention on everything today.
21            THE COURT:  That's fine.
22            MR. CORMICAN:  From a judicial economy standpoint,
23  that makes sense and Mr. Miller will agree and you can confirm
24  it with him.
25            THE COURT:  All right.  So, Mr. Miller, I'm going to
```

1  go through the procedures that I have to do for initial

2  appearance so we don't have to bring you back for another one.

3          THE DEFENDANT:  That's fine.

4          THE COURT:  And if you want to go forward with the

5  detention hearing today, then we'll do that.

6          THE DEFENDANT:  Okay.

7          THE COURT:  And give you time to hire counsel, et

8  cetera, but you're here then --

9          THE DEFENDANT:  Thank you, Your Honor.

10          THE COURT:  Okay.  So you're here on an initial

11  appearance, which is a new charge which is a criminal complaint

12  that I will explain in more detail in a minute.

13          But, first, let me ask you with respect to the initial

14  appearance and detention hearing, we're doing this by Zoom

15  video conference because of your safety and ours because of the

16  pandemic.

17          Is that what you want to do is go forward with the

18  both hearings by Zoom as opposed to being in open court?

19          THE DEFENDANT:  Well, I mean, I would like open court,

20  but I guess we're here now.  So we could do it this way for

21  now.

22          THE COURT:  I could put you in open court right now,

23  but I can't require anyone else to be there.  So if you want to

24  be in court --

25          THE DEFENDANT:  Oh, no, that's fine, Your Honor.

```
 1   That's fine, then, Your Honor.  We could do it this way.  I
 2   didn't understand.  I'm sorry.
 3           THE COURT:  Are you sure?
 4           THE DEFENDANT:  Yes, Your Honor.  If this is the
 5   safest way for everyone, then that's okay.
 6           THE COURT:  All right.  Mr. Cormican, are you
 7   satisfied that he understands his rights and is willing to make
 8   a knowing and voluntary and intelligent consent with Zoom?
 9           MR. CORMICAN:  Yes, Your Honor.
10           THE COURT:  All right.  I'm going to find a knowing
11   and voluntary waiver the right to be in open court and consent
12   to Zoom for purposes of this hearing only.
13           Mr. Miller, you are charged in a criminal complaint
14   with a one-count of possession of ammunition by a convicted
15   felon and another charge of possession of an unregistered
16   short-barreled rifle.  The maximum penalty on each is ten
17   years.
18           Is that right, Mr. Bhat?
19           MR. BHAT:  It is, yes.
20           THE COURT:  And there's no minimum on either one?
21           MR. BHAT:  That's correct, Your Honor.
22           THE COURT:  So the maximum penalty on those charges is
23   ten years.  There also could be other penalties like a fine,
24   supervised release and other penalties.
25           Do you understand what you're charged with and how
```

1  much time you're facing?

2       THE DEFENDANT:  Yes, I do, Your Honor.

3       THE COURT:  You have a right to have a lawyer to

4  represent you at every stage of the proceedings.  If you didn't

5  have enough money to hire a private lawyer, I could take

6  testimony to see if you qualify for a court appointed lawyer.

7       Are you asking to go forward today with the detention

8  hearing with Mr. Cormican and Mr. Kent and ask for more time to

9  hire another lawyer to represent you through the duration of

10 both of these cases?

11      THE DEFENDANT:  Yes, Your Honor.

12      THE COURT:  All right.  At the conclusion of this --

13 well, actually we'll do it now.  You also have a right to a

14 reasonable bond.  Is the Government requesting pretrial

15 detention on this case as well?

16      MR. BHAT:  Yes, Your Honor.

17      THE COURT:  And you're ready to go forward with both

18 cases here today?

19      MR. BHAT:  That is correct, Your Honor.

20      THE COURT:  And again, to be clear, Mr. Cormican and

21 Mr. Kent, you're going forward on a temporary basis with the

22 detention hearing addressing both charges, correct?

23      MR. CORMICAN:  Yes, Your Honor.

24      THE COURT:  Knowing that's what you want?

25      THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  All right.  Also, you have a right to

2  arraignment and a preliminary hearing on the second charges.

3  There is no reason why we can't do a preliminary hearing on

4  these charge because as part of the detention hearing, I'm

5  going to make a probable cause finding or not anyway.

6    So if we do the preliminary hearing today and we will

7  set it for arraignment.  What time do you want the arraignment,

8  Mr. Bhat?

9    MR. BHAT:  Your Honor, 14 days would be fine with the

10  Government.

11    THE COURTROOM DEPUTY:  14 days is March 24th.

12    THE COURT:  So we're going to set you for arraignment

13  on both charges.  I assume that will be added to the indictment

14  or they could do a separate indictment, but you haven't been

15  arraigned on the first one either.  So we're going to set this

16  for March 24th --

17    THE COURTROOM DEPUTY:  Your Honor, I can't hear you.

18    THE COURT:  Mr. Miller, I'm going to mute you.  Was it

19  just the background noise, or are you not hearing me?

20    THE COURTROOM DEPUTY:  No, it was the background

21  noise.  I could hear you perfectly right now.

22    THE COURT:  Mr. Miller, this is uncomfortable, but

23  we're going to do what we can.  So we're going to set this for

24  arraignment on the 24th at 11:00.  At that point, you have to

25  have permanent counsel and your permanent counsel will do the

1    arraignment at that point.  I'm not going to set a separate

2    report re counsel date because we're already taking care of

3    bond here today.  So the 24th for arraignment.

4           You probably already had this happen in your first

5    initial, but I can't be sure.  So I am letting you know that if

6    you are not a U.S. citizen, you have a right to ask the

7    Government to contact the consular officer from your home

8    country and let them know that you have been arrested.  I don't

9    know if that applies to you, but I have to give you that

10   advice.  I won't do the *Brady* advice until arraignment.

11          So with that being said, is everybody ready to go

12   forward with pretrial detention?

13          MR. BHAT:  Yes, Your Honor.

14          MR. CORMICAN:  Yes, Your Honor.

15          MR. KENT:  Yes, Your Honor.  I think you can hear me.

16          THE COURT:  I can hear you.

17          All right.  Mr. Miller, I'm going to leave you muted.

18   If at any time you want to talk to your lawyer, just raise a

19   hand or something, but because of the noise in the background,

20   it is going to be better for everybody if we leave you muted

21   during this hearing; okay?

22          All right.  Mr. Bhat, you may proceed by proffer, if

23   you wish, as long as there is a knowledgeable agent available

24   for cross-examination.  If you do proceed by proffer, as part

25   of that proffer, let me know what the basis of the request is.

1 Meaning, risk of flight or danger to the community or both.

2 Also, whether there is a presumption and also if you know what

3 kind of guidelines Mr. Miller will be facing if convicted of

4 the charges he is facing.

5    MR. BHAT:  Yes, Your Honor.

6    To summarize briefly, the charges that Mr. Miller is

7 facing are one count of possession of a firearm by convicted

8 felon dated 2018.  And then, there is the criminal complaint

9 that charges one count of possession of ammunition by a

10 convicted felon and one count of possession of an unregistered

11 short-barreled rifle both in March of 2021.

12    The guidelines on just the indicted count are

13 approximately 37 to 46 months imprisonment without acceptance

14 of responsibility.  There's a ten year statutory maximum.  And

15 with the additional counts included, the Government's

16 approximate guidelines calculation is 46 to 57 months without

17 acceptance of responsibility and a grand total on all three

18 charges of 30 years statutory maximum punishment.

19    The basis for the Government's request for detention

20 hearing today is that all of the charged counts involve the

21 possession of a firearm.  In addition, the Government believes

22 that the Defendant presents a serious risk of flight and also a

23 serious risk of threatening, injuring, intimidating, or

24 attempting to threaten, injure, or intimidate prospective

25 witnesses.

1          FBI Special Agent Collin Gregory, who is one of the

2   case agents on this case and is knowledgeable, is present in

3   court and is available for cross-examination.  And I will

4   proceed by proffer, if that's all right with Your Honor.

5          THE COURT:  Yes.  But just to be clear, are we in that

6   other subsection that requires a higher standard of proof of

7   serious risk because it's a firearm?

8          MR. BHAT:  No, Your Honor.

9          That's the basis for the Government's request for

10  detention hearing today.  The Government is seeking detention

11  substantively under 3142(g) for both risk of flight and danger

12  to the community.

13         THE COURT:  All right.

14         MR. BHAT:  Your Honor, if I --

15         THE COURT:  There's clearly a presumption, but are we

16  under (f)2(a) and (b) serious risk of --

17         MR. BHAT:  Your Honor, the basis for the Government's

18  request for detention hearing is really the offense involves a

19  firearm.  So that's the basis, the primary basis for about

20  Government's request for detention hearing.

21         But the Government also believes that the items

22  outlined in 3142(f)2(a) and (b) present an additional bases for

23  the Court to hold the hearing today.  So the Government is

24  actually substantively seeking to detain Mr. Miller on 3142(g)

25  factors, which I can get into argument later on.

1          THE COURT:  Okay.  And because it is a gun -- I was

2    misreading it.  Because there is a gun involved it's

3    appropriate under (F)(1)(e) so you're not under the heightened

4    standard of 2(a) and (b).

5          MR. BHAT:  Correct, Your Honor.

6          THE COURT:  Go ahead.

7          MR. BHAT:  Thank you, Your Honor.

8          Paul Miller is a convicted felon.  Court documents

9    from New Jersey show that in 2007 Mr. Miller pled guilty to

10   possession with intent to distribute a controlled dangerous

11   substance and aggravated assault, which are both bound under

12   New Jersey law.

13         As part of the investigation into Miller, authorities

14   inquired with the State of New Jersey as to whether Miller had

15   received clemency and confirmed that he never had.  Further

16   pre-transcripts showed that Miller was advised and understood

17   that the offenses to which he later pled guilty carried maximum

18   terms of imprisonment of over one year and the probation

19   document that Miller signed in October of 2007 specifically

20   advised that he was not permitted to possess firearms.

21         Nevertheless, on or about January 17th of 2018, Mr.

22   Miller went to a firearms range in Fort Lauderdale, Florida and

23   completed a live firearms training course.  The course involved

24   Mr. Miller firing a specific handgun known to law enforcement

25   which is manufactured outside of Florida and had, therefore,

1  traveled in interstate commerce before Miller possessed it.

2         Witnesses would testify to Mr. Miller's participation

3  in that course or to the validity of documents evidencing Mr.

4  Miller's participation in that course.

5         A week later, Mr. Miller applied to Florida

6  authorities for a concealed weapons license.  The application

7  contained Mr. Miller's sworn statements that he had taken the

8  firearms training, but also a false statement that he had never

9  been convicted of a felony.

10         Florida authorities denied the application based on

11  Mr. Miller's prior felony convictions and sent Mr. Miller a

12  letter in 2018 confirming that the convictions were the reason

13  for the denial.

14         Mr. Miller was arrested on the indictment in the case

15  of 21-cr-60067-Singhal on March 2nd of 2021.  A FBI SWAT team

16  executed the warrant due to concerns about the likelihood that

17  Mr. Miller would have firearms in the home.

18         When they arrived and announced their presence, Mr.

19  Miller exited the home briefly and returned inside for several

20  minutes and then, ultimately, came back out to surrender to

21  authorities.

22         After his arrest, Mr. Miller waived his Miranda rights

23  and gave a recorded statement, which is recorded by both video

24  and audio and is in law enforcement's possession.

25         During the recorded statement, Mr. Miller was shown a

1  copy of a certificate of completion for the 2018 firearms

2  course he had taken.  Mr. Miller confirmed that he had, in

3  fact, taken that course.

4         Moreover, Mr. Miller down-played the crime charged in

5  the indictment and expressed disbelief that he could be

6  arrested for events that occurred in 2018 given that his felony

7  convictions were in another jurisdiction and were from seven

8  years ago.

9         In conjunction with Mr. Miller's arrest on the

10  indictment, authorities executed a federal search warrant at

11  Mr. Miller's residence.  Mr. Miller was the only person in the

12  residence at the time and, per his landlord, was the only

13  person who lived there.

14         Inside, authorities found a lower receiver for a rifle

15  attached to a collapsable rifle stock and disassembled from an

16  upper receiver featuring a 10.5-inch barrel.  As well as a

17  magazine fully loaded with .223-caliber ammunition altogether

18  in a dryer amidst Mr. Miller's clothes.

19         And none of these parts bore any manufactured markings

20  or serial numbers.  Additionally, law enforcement recovered

21  from Mr. Miller's residence hundreds of rounds of ammunition in

22  various calibers, including .9 millimeter and .223-caliber

23  ammunition, which is the same caliber of ammunition in the

24  magazine that was discovered in the dryer.

25         The ammunition is manufactured outside of Florida and

1  therefore, moved into interstate commerce before coming into

2  Mr. Miller's possession.

3          Additionally, authorities found in the home a tactical

4  vest containing plated body armor inserts, what appeared to be

5  a combat knife, and copies of Mr. Miller's New Jersey judgment

6  of convictions for his prior felony offenses.

7          An agent from Bureau the Alcohol Tobacco and Firearms

8  and Explosives, with over 20 years experience, observed the

9  parts recovered from Mr. Miller's dryer in his home in person

10  during the day of the search warrant.  And confirmed that those

11  parts could together be readily assembled to create an

12  operational rifle with a barrel of less than 16 inches.

13          Further a search of the National Firearms Registration

14  and Transfer Record revealed that no firearms had been

15  registered to Miller under the National Firearms Act.

16          During Mr. Miller's recorded post Miranda statement,

17  he alleged that he and his family had received recent threats

18  from Antifa and Black Lives Matter.  And that he had,

19  therefore, tried to build a rifle by purchasing an upper

20  receiver, a lower receiver, and a trigger from gun shows and

21  subsequently watching tutorials on YouTube to try to put the

22  rifle together himself.

23          Mr. Miller made reference to his belief that Florida

24  was more permissive of these sorts of firearms activities than

25  in his home state of New Jersey.  Although he claimed that the

1  rifle did not work and repeatedly jammed, Mr. Miller

2  acknowledged that he had fired the rifle one time at a range.

3       Authorities separately executed a federal search

4  warrant at Mr. Miller's vehicle, which had been present at his

5  residence parked outside the day of the arrest and discovered

6  one spent .223-caliber shell casing, which matches the shell

7  casing found in the magazine next to the short-barreled firearm

8  parts.

9       Mr. Miller also defended his possession of the rifle

10  during his post Miranda statement by stating that he did not

11  know that he was doing anything illegal and he expressly said

12  and acknowledged that he was living alone.

13       He also said that he had attempted to build a gun

14  rather than purchase a gun because he believed America was on

15  the brink of collapse and that firearms manufacturing would be,

16  quote, a good skill to learn as a result.

17       Mr. Miller also acknowledged during his post Miranda

18  statements that he had bought ammunition at gun shows on

19  unspecified dates.  Mr. Miller claimed that he had bought 400

20  rounds of what he thought was .223-caliber ammunition for about

21  $500.

22       Mr. Miller also made post Miranda statements relating

23  to his prior felony convictions.  Specifically, Mr. Miller

24  described the facts underlying his New Jersey aggravated

25  assault conviction in which he fired a pellet gun out of the

1  window and hit people, which Mr. Miller claimed that he did not

2  realize he was doing.

3         Mr. Miller also said there was some, quote, drug

4  stuff, but that it had all been expunged.  When asked what

5  steps he had taken to initiate or verify expungement of his

6  prior drug conviction, Mr. Miller said that he had not taken

7  any steps to do either.

8         Mr. Miller also confirmed receiving a letter from

9  Florida authorities denying his concealed carry application in

10 2018.  That letter, which is in law enforcement's possession,

11 included a listing of Miller's felony convictions and an

12 explanation that the convictions was the reason for the denial

13 of the concealed weapons license.

14        Based on Mr. Miller's prior felony convictions and

15 knowledge of those convictions, his knowing possession of items

16 in his home on March 2nd of 2021 and the recorded post Miranda

17 statements, this Court approved a criminal complaint yesterday

18 charging Mr. Miller with possession of ammunition by a

19 convicted felon and possession of an unregistered

20 short-barreled rifle.

21        Mr. Miller's reasonable action also corroborate his

22 continued interest and fascination with firearms and

23 ammunition.  On or about February 5th of 2021, video and audio

24 footage from a firearms range and store located in Davie,

25 Florida showed Mr. Miller and person one entering and showed

1   person one purchasing parts for a handgun.

2          Person one and Miller then came back to the store

3   within 20 minutes and returned the gun parts.  While returning

4   the gun parts, person one stated that a person with whom he had

5   a familial relationship, apparently Mr. Miller could, quote,

6   get the parts cheaper.

7          Mr. Miller also inquired about buying ammunition, but

8   did not buy any.  Person one and Mr. Miller then communicated

9   that they would and could get ammunition elsewhere.  Mr. Miller

10  also admitted during his post Miranda statement that he had

11  also gone to the range in Davie alone on a different occasion

12  and fired a rifle.

13         Stepping back from Mr. Miller's possession of firearms

14  and ammunition, Mr. Miller is active on the Internet and

15  routinely uses his social media platforms to issue and monetize

16  public graphic and specific threats of violence to specific

17  individuals to mobilize his substantial Internet following to

18  harass and threaten members of specific groups.

19         Typically, African Americans, gays, Jews, and

20  transgender people.  To document his in-person harassment of

21  African Americans and to call for a race based civil war that

22  will bring about the mere term downfall of the United States

23  Government.

24         Mr. Miller's primary venue for these statements is a

25  page on the social media network Telegram, which is available

1  worldwide on the Internet and there is specifically a page

2  called Gypsy Crusader News Network.  As of March 2nd of 2021,

3  the day of his arrest, Mr. Miller had 42,600 followers on that

4  page.

5         Hundreds of photographs of Mr. Miller and videos of

6  Mr. Miller posted to this page matched the photographs of Mr.

7  Miller submitted with the failed 2018 application for a Florida

8  concealed weapons license.  Mr. Miller also made post Miranda

9  statements claiming ownership of this Gypsy Crusader News

10 Network, Telegram account, and alluding to his large on-line

11 following.

12         Mr. Miller has intimidated others on-line through this

13 platform by producing and publicizing hundreds of videos.

14 Literally hundreds of videos in which he dresses in costume and

15 issues threats, often of graphic violence on Omegle, which is a

16 website that connects random strangers for video chats over the

17 Internet via webcam.

18         Mr. Miller regularly broadcasts these Omegle chats via

19 Internet live stream to an audience of followers on a platform

20 such as a website Bitwave; Bitwave.  He records those sessions

21 and then he posts the video recordings to various social media

22 websites including his Telegram page.

23         In return for making this, what he calls show, a show,

24 Mr. Miller asks on his Telegram account for donations and sells

25 related merchandise.  Including merchandise of Nazi

1   paraphernalia on the website.  Mr. Miller said in his post

2   Miranda statement that these donations and sales were his only

3   source of income.

4        The videos that are posted to the Telegram include

5   weapons.  At least six of the Omegle video chat recordings

6   posted to the Telegram account in February of 2021 appeared to

7   depict Miller with a handgun.

8        Other videos involve other weapons like the combat

9   knife.  Virtually all of the videos involve invective towards

10  minority groups and many include explicit threats to specific

11  people in the one-on-one video.

12        For example, agents observed an Omegle video chat

13  posted to the Gypsy Crusader News Network page on Telegram on

14  or about December 17th of last year of 2020, which appeared to

15  show a one-on-one conversation between Mr. Miller and an

16  African-American person.  Mr. Miller stated while waving what

17  appeared to be a combat knife.

18        And Your Honor, I will say now, just to make the

19  record clear, the words that Mr. Miller used should be clear to

20  the Court from the context.  I'm not going to say them

21  personally but he, in fact, did in these videos say the things;

22  the full words, the full slurs.

23        "What if I say lynch all the N words?  What if I say

24  scalp the N words?  Scalp them because I want to scalp you, you

25  see."

1        Referring to the African-American male in the chat.

2        "Like in my perfect world, when F hits the fan, I'm

3  going to go around and once I get one of you, when I get one of

4  you, I'm going to scalp you.  I'm going to shine my boots up

5  with it because your hair is really greasy and I think the

6  grease will make the boots shine.  What do you think?"

7        Agents observed an Omegle video chat posted to the

8  Gypsy Crusader News Network, Telegram, on or about

9  December 18th of 2020.  The video chat appeared to be between

10  Miller and a person that Miller perceived to be gay.

11        Miller stated:  "Let's say it happens tomorrow, right?

12  Civil war.  What do you think guys like me are going to do to

13  guys like you?  What do you think we're going to do?

14        We're going to F'g kill you.  No, we're going to kill

15  you.  We're going to kill you.  We're going to line you up

16  against a wall.  We're going to shoot you.  Done."

17        Agents observed an Omegle video chat posted to the

18  Gypsy Crusader News Network, Telegram, on or about Christmas

19  Day of 2020, December 25th.

20        The video chat appeared to be between Miller and a

21  person Miller perceived to be transgender.  Miller held what

22  appeared to be a handgun by the barrel as if to invite the

23  other person to take the firearm and said, quote:

24        "Here, one less of you around is better.  Listen to

25  me, there's a -- I'm going to just drop the act for a second so

1  you understand because I'm serious.  I hate people like you.

2  There's a civil war coming in this country and when people like

3  me are off the leash, we are going to hang you.  Do you

4  understand?

5          We are going to take you.  All right.  We're going to

6  beat the living F out of you.  We're going to string you up to

7  a pole.  Do you understand?

8          And then, we're going to shoot your dead body because

9  people like you are F'g disgusting.  You shouldn't exist.  You

10  shouldn't exist.  All right.  I'm just going to drop all the

11  F'g act."

12          Agents observed a Omegle video chat posted to Miller's

13  Telegram account on or about February 10th of 2021.  The video

14  chat appeared to be between Miller and an African-American

15  person as well as another person.

16          Miller said to the black person" "I said you're an N

17  word.  What's the matter?  What are you, deaf?  You F'g

18  C-O-O-N.  Huh?  Why don't you take the fried chicken out of

19  your F'g ears.  Take that Do-rag off of your F'g head.  I want

20  to smack it off."

21          Miller then retrieved what appeared to be a combat

22  knife and added:  "You know what I want to F'g do really?  I

23  want to -- can I just cut it off of you?  Scalp it?"

24          Agents observed a Omegle video chat posted to Miller's

25  Telegram account on or about February 14th of 2021.  The chat

1   appeared to be between Miller and two African-American

2   individuals.

3          Miller stated while waving around what appeared to be

4   a handgun:  "You're a F'g N word B word.  Line you the F up

5   against the wall N word, you're an N word."

6          In addition to these threat videos, Mr. Miller has

7   also migrated it appears into live attempts to instigate

8   in-person conflict, which he videotapes and then posts to the

9   Telegram channel.

10          In a recurring series of videos and images posted to

11   Miller's Telegram channel, which Miller calls, quote, N word

12   encounters, Miller posts videos in which he appears to harass

13   African-American strangers in public.

14          In one video that appeared to have been filmed in a

15   strip mall parking lot with visible vehicles bearing Florida

16   tags, Miller's voice is audible.  And Miller filmed two

17   African-Americans while himself making loud audible monkey

18   noises like 'ooo-ooo, aah-aah' and 'ooga-booga.'

19          In another video, Miller recorded an African-American

20   man in what appears to be a parking lot and Miller's voice is

21   audible.  Miller repeatedly calls the man the N word and

22   threatens to beat the man savagely using other profanity.

23          In another video, Mr. Miller recorded an

24   African-American woman at a call window in which Mr. Miller's

25   voice is audible.  Mr. Miller stated his disdain for

1   African-Americans and Jews.  When the woman stated that she was

2   Jewish, Mr. Miller said, quote:  "Double gas to you."

3          Mr. Miller has also indicated a willingness to

4   mobilize his substantial Telegram following to try to harass

5   and threaten others.  Specifically, law enforcement received

6   information and confirmed based on Miller's public Telegram

7   posts that in December of 2020, Mr. Miller coined the term,

8   quote, Project Mayhem, which appeared to have furthered efforts

9   to get his own social media following to harass and threaten

10  specific people.

11         A victim reported and the Government confirmed public

12  posts to Mr. Miller's Telegram channel in December of 2020 that

13  under the Project Mayhem moniker, Mr. Miller asked his

14  followers to, quote:  Raid a specific individual after

15  claiming, quote, this is the N word who is harassing my family.

16  He thinks we are not many.  Please let him feel the heat.

17         Mr. Miller then posted that individual's phone number,

18  that individual's father's phone number, and that individual's

19  social media accounts to Telegram.  Soon thereafter, that

20  individual reported threats by phone and text message.

21  Including one from a person who identified himself as, quote,

22  Paul and a text stating:  "Paul Miller gives his regards."

23         Later in the month, Mr. Miller used the same Project

24  Mayhem terminology to direct his followers to engage in

25  another, quote, 'raid' to harass the social media accounts on

1  Twitter that belong to now President Biden and Vice President

2  Harris.  The followers appeared to have done so by repeatedly

3  posting comments and sending direct messages to those accounts

4  featuring Nazi iconography and racial slurs.

5          In addition to his efforts to harass and threaten

6  specific individuals by leveraging his social media following,

7  Mr. Miller has alluded to the strength of his followers.

8  Agents observed the monologue video posted to Miller's Telegram

9  account on or about January 19th of 2021.

10          After describing an FBI raid on another individual

11  that had occurred earlier that month, Mr. Miller stated:

12          "I don't see any reason for them to come for me for

13  any reason.  But if they do for some reason, as I said before,

14  it's not going to stop anything.  It's just going to kind of

15  accelerate it more, and more, and more and it's going to kind

16  of radicalize a lot of people if they do it.  So it's all up in

17  the air, but I'm all right.

18          Mr. Miller stated during his post Miranda interview

19  that he has a, quote , big following on social media:  "And

20  when they hear about this, it is going to be really wild.  I

21  have 45,000 followers."

22          Finally, Mr. Miller's on-line posting suggest a

23  preoccupation with the concept of a coming race based civil war

24  in the United States.

25          During his recorded post Miranda statement after his

1   arrest, Mr. Miller reasserted his belief expressed in many of

2   the threat videos that a civil war was coming and explained

3   that his possession of firearms parts and his effort to build

4   those firearms was an effort to obtain a, quote, good skill for

5   the coming war.

6          Relatedly, Mr. Miller has routinely posted a Telegram

7   about his belief that American society is about to collapse and

8   that he has an obligation to hasten that collapse.

9          For example, on February 19th of 2021, Mr. Miller

10  posted the Telegram, quote:  "What is our mission?  To

11  accelerate the coming collapse of America.  This is not by our

12  choosing.  We didn't want this fight.

13         The Jews and the N words brought this war to us.  They

14  brought it to your jobs, your schools, your favorite TV shows.

15  They are the ones forcing it down people's throats.

16         The system cannot be fixed.  It must fall and rebuild

17  anew so it can protect our culture, our people, and our way of

18  life.  I hope to see it one day with you all."

19         That concludes the actual proffer, Your Honor.  And

20  FBI Special Agent Collin Gregory is available for

21  cross-examination.

22         THE COURT:  Mr. Cormican, are you doing the cross?

23         MR. CORMICAN:  Yes, Your Honor.

24         THE COURT:  Troy, do you want to swear in Mr. Gregory,

25  please?

```
1          THE COURTROOM DEPUTY:  I'm sorry, Your Honor.  I was
2    talking to the U.S. Marshal to try to get the minutes right.
3          THE COURT:  Okay.
4          THE COURTROOM DEPUTY:  Raise your right hand, please.
5          THE WITNESS:  (Complied.)
6    (Witness sworn.)
7          THE COURTROOM DEPUTY:  Thank you, sir.
8          State your name for the record and let us know what
9    agency you work for.
10         THE WITNESS:  Special Agent Collin Gregory with the
11   Federal Bureau of Investigation.
12         THE COURT:  All right.  Agent Gregory, did you hear
13   the proffer?
14         THE WITNESS:  Yes, sir, I did.
15         THE COURT:  Is it accurate?
16         THE WITNESS:  Yes, sir.
17         THE COURT:  Is there anything that you would like to
18   change or add?
19         THE WITNESS:  No, sir.
20         THE COURT:  All right.  Are you prepared then to adopt
21   that as your direct testimony?
22         THE WITNESS:  I am.
23         THE COURT:  All right.  Mr. Cormican, you have may
24   proceed, or Mr. Kent.
25         MR. CORMICAN:  Thank you, Your Honor.
```

1     FBI S/A COLLIN GREGORY, GOVERNMENT'S WITNESS SWORN

2                       CROSS EXAMINATION

3   BY MR. CORMICAN:

4   Q.   Special Agent Gregory, good afternoon.

5   A.   **Good afternoon.**

6   Q.   I would like to begin by focusing on the issue of this

7   on-line persona that the proffer mentioned Mr. Miller had

8   adopted wherein he is known as a Gypsy Crusader.  And as part

9   of that persona it was proffered that he would engage in the

10  publication broadcast of a, quote unquote, show on the

11  Internet.

12      Have you had the opportunity to review segments of that

13  show that were referenced in the proffer?

14  A.   **Yes.**

15  Q.   Okay.  Now, during the broadcast of that show, Mr. Miller

16  frequently appears in costume; isn't that correct?

17  A.   **That's correct.**

18  Q.   Including the Joker and the Riddler from Batman and Super

19  Mario from the Mario Brothers and he wears clown makeup and

20  employs props; isn't that correct?

21  A.   **Yes, sir.  That's correct.**

22  Q.   And while he's doing that he often uses, as the proffer

23  mentioned, racist and offensive language isn't that correct?

24  A.   **That's also correct.**

25  Q.   And typically, that's used in a confrontation with another

1  person.  Or often is used in a confrontation with another

2  person on-line; isn't that right?

3  A.  **Yes.**

4  Q.  All right.  And he frequently uses an on-line platform that

5  is known as Omegle to do that; is that right?

6  A.  **Correct.**

7  Q.  And are you familiar with how Omegle works?

8  A.  **Yeah, I have a familiarization of the platform.**

9  Q.  Okay.  And essentially, what Omegle is, is an on-line video

10 chat platform that randomly connects users with one another for

11 a video chat.

12      Is that a safe way to characterize it?

13 A.  **Yeah, that would be an accurate characterization.**

14 Q.  All right.  So just like me and you are speaking over a

15 video chat program right now, if we were using Omegle, it would

16 just randomly connect us together and we could start talking to

17 one another?

18 A.  **Correct.**

19 Q.  All right.  So what occurs on the Gypsy Crusader show is

20 Mr. Miller would go onto this platform in some outrageous

21 costume.  And when a person popped up on the screen was a

22 minority, or a homosexual, or whatever, he would then insult

23 that person and elicit a reaction from that person; isn't that

24 correct?

25 A.  **Yes, that's correct.**

1  Q.   And then, very frequently they would start arguing with one

2  another based on his interaction with them, right?

3  A.   **Some of them, yes.**

4  Q.   All right.  And they would both start dishing it out to one

5  another for the time that this Omegle thing is going on, right?

6  A.   **I don't know if say dishing it out, at least on the**

7  **potential victim's part, would be fair.  The reactions vary.**

8       **A lot of them are in disbelief and shock.  And some of them**

9  **just ask questions, but the videos in reference in the proffer,**

10 **those particular individuals did not, like, fight back or offer**

11 **additional insults or anything like that.**

12 Q.   But in your review of these show segments and recordings,

13 sometimes the people fight back, right?  And sometimes they

14 threaten him as well, right?

15 A.   **I have not seen any where people have threatened him.**

16 Q.   Have you seen them get angry at him?

17 A.   **Again, the ones that I have seen, there is a general**

18 **disbelief and shock.**

19 Q.   All right.  And does the person on the other end of the

20 communication have the ability to terminate it?

21 A.   **Yeah.  The way the application works, there's essentially**

22 **like a skip button.**

23 Q.   And that moves you on to the next encounter with the next

24 random person; is that right?

25 A.   **Yeah, that's my understanding.**

1  Q.   Now, of those people that were referenced in the proffer

2  that had interactions with Mr. Miller, do you have any evidence

3  that Mr. Miller ever actually committed any act of violence

4  against any one of them?

5  A.   **In person it was basically just the threat of violence**

6  **through the chat application.**

7  Q.   And now, the Omegle chat, it doesn't let you know where the

8  person who you are talking to is, right?

9  A.   **Not to my knowledge.  I'm not aware.  There may be a**

10 **feature with that, but from what I've seen, I am not aware of**

11 **that feature.**

12 Q.   And there's not any way that you can identify even who that

13 person, other than if you recognized their face, right?

14 A.   **That would probably be accurate.**

15 Q.   All right.  So that's not even any way for someone using

16 that application to go find somebody that they're talking to,

17 right?

18 A.   **There may be ways to capture IP address information from**

19 **those chats.  I don't know.  I'm not a cyber expert, but I do**

20 **know that technologies like that, you know, do exist.**

21 Q.   But you're not aware of any actual physical interaction

22 between Mr. Miller and any of these people that he encounters

23 through this Omegle chat application?

24 A.   **Not through Omegle, sir.**

25 Q.   Okay.  And then, what he actually does through the Gypsy

1  Crusader show is he records these interactions and then plays
2  them for the audience during the show, right?
3  A.  **So the shows are recorded, but he also live streams the**
4  **interactions.  So you could watch live as it's happening.**
5  Q.  And so he incorporates into the show these interactions
6  with people on Omegle?
7  A.  **Yes.**
8  Q.  And then, he presents that to his audience as entertainment
9  for them, correct?
10 A.  **Yes.**
11 Q.  Okay.  Now, he also, essentially, that's how he earns his
12 income as far as you know, right?  Based on what he has told
13 you is that he supports himself by putting this show on; isn't
14 that right?
15 A.  **That's correct.**
16 Q.  And he sells merchandise and solicits donations from his
17 followers, or fans, or whatever you want to call them.
18     And he has indicated to you that he has tens of thousands
19 of people that watch this thing, right?
20 A.  **Tens of thousands of subscribers, yes, to the channel.**
21 Q.  Now, were you able to independently verify that?  Does the
22 channel display how many people follow it or whatever?
23 A.  **Yes, sir.**
24 Q.  So he has a considerably large following of people that
25 find this type of entertainment enjoyable, right?

1  A.   **Yes.**

2  Q.   Okay.  Now, the shows themselves, they never actually

3  depict any act of violence, right?  He doesn't actually film

4  himself committing an act of violence, or fighting anyone, or

5  using a weapon towards anyone, or anything like that?

6  A.   **Well, I mean, in these videos, at least the Omegle videos,**

7  **Mr. Miller did brandish various types of weapons and did**

8  **include what appeared to be firearms as well as large knives.**

9       **So, you know, he does display and brandish weapons in those**

10 **videos.**

11 Q.   And you're not able to discern whether those are actual

12 weapons or props, right?

13 A.   **As far as the firearms are concerned, it is difficult to**

14 **tell from the videos whether they are real or would be props.**

15 **The knife does look real.**

16      **And a subsequent search warrant executed on the residence**

17 **did verify that the knife is, in fact, real.  And there was a**

18 **prop replica gun recovered as well.**

19 Q.   All right.  And back to my original question.

20      I mean, I asked you if the show or the video ever depicted

21 an actual act of violence and you said, well, he displayed

22 weapons.

23      He never actually depicted any act of violence on the video

24 or the shows, right?

25 A.   **Not that I've seen an actual act.**

1  Q.   Right.  Now, the proffer also included some information

2  about what were called raids or Project Mayhem where Mr. Miller

3  would encourage viewers of his show to contact other people or

4  to engage in behaviors, right?

5  A.   **Basically harassment campaigns.  Yes, sir.**

6  Q.   And specifically, the proffer referenced a harassment

7  campaign against Joe Biden and Kamala Harris; is that correct?

8  A.   **That's correct.**

9  Q.   And now, what exactly did Mr. Miller encourage people to

10 do?

11 A.   **Based on the publically available screen shots from there,**

12 **we were able to identify Mr. Miller basically directing his**

13 **followers to essentially spam or troll the Twitter accounts**

14 **associated with then Vice President Elect Biden and Kamala**

15 **Harris.**

16 Q.   So these are the publically accessible and available

17 Twitter accounts of the current President and the Vice

18 President of the United States, right?

19 A.   **That's correct.**

20 Q.   And at the time this happened, I guess, were they

21 candidates for president and vice president?

22 A.   **Yeah.  I don't want to misspeak.  They weren't candidates.**

23 **I think they hadn't possibly won the election at that point.**

24 Q.   Okay.  This would have been president elect and vice

25 president elect, period?

1  A.  **That's exactly it, sir.**

2  Q.  And when you have say troll and spam, essentially what they

3  were doing, when a person makes a tweet on Twitter, which

4  President Biden or Vice President Harris would do, anybody that

5  has a Twitter account can go and leave a comment there and

6  state their opinion, right?

7  A.  **That's my understanding how Twitter works, yeah.**

8  Q.  And that's what he was encouraging them to do, right?

9  A.  **He was encouraging them, yes, to basically spam those two**

10  **publically facing Twitter accounts.**

11  Q.  When you say spam, usually spam means you are trying to

12  sell a product to somebody or something, or sending out a

13  solicitation.

14     Is that what he was trying to -- is that what they were

15  engaged in?

16  A.  **Not as far as solicitation.  In this particular reference,**

17  **troll may be a better terminology as opposed to spam which, you**

18  **know, trolling on the Internet typically is a form of**

19  **harassment.**

20  Q.  Okay.  Well, I'm looking at a CHS reporting document that

21  you completed that has a bunch of screen captures attached to

22  it.  And without getting into all of them, I mean, a lot of

23  these will be people posting things like Gypsy Crusader won the

24  election.

25     Would you consider that to be harassment and spam?

1  A.  **I think it's debatable, sir.**

2  Q.  So if some person that likes Paul Miller's show posts a

3  comment to Joe Biden saying that Gypsy Crusader actually won

4  the election, I mean, you might think that that's a silly or

5  ludicrous statement but, I mean, that that's person opinion and

6  they're entitled to it, right?

7  A.  **Certainly they're entitled to that opinion, yeah.**

8  Q.  And that wouldn't be spam or harassment in any way.  They

9  are just persons just stating their opinion, right?

10  A.  **It certainly wouldn't be offensive.**

11  Q.  All right.  And again, this is not Paul Miller doing this,

12  right?  These are people that watch his program who are doing

13  this, right?

14  A.  **Yes, at his direction.**

15  Q.  And he would say, let's all get together and comment on

16  whichever Twitter comment is out there, right?

17  A.  **Yeah.**

18  Q.  Do you know how long the Gypsy Crusader channel has been in

19  operation?

20  A.  **You know, I don't know the exact length of time.**

21  Q.  Are you aware of any act of violence that was committed by

22  the Defendant during the time that he was operating the Gypsy

23  Crusader channel?

24  A.  **No.**

25  Q.  Okay.  The first indictment in this case, the one from

1  2018, involved acts that occurred early in 2018, right?  Like,

2  I believe in January of 2018; is that correct?

3  A.  **That's correct.**

4  Q.  All right.  And so it has been over three years since those

5  acts have occurred, right?

6  A.  **Yeah.**

7  Q.  Are you aware of any actual act of violence that Mr. Miller

8  has engaged in, in that three-year period of time?

9  A.  **No.**

10  Q.  All right.  And during that time he was actually kind of a

11  high profile person, right, on the Internet?

12  A.  **In certain circles.  I would say that.**

13  Q.  But he wasn't making any attempt to conceal himself, or to

14  hide, or anything like that during that period of time, right?

15  A.  **It did not appear so based on the public channels that he**

16  **operated.**

17  Q.  But the Government waited three years to pick him up at

18  that point, right?

19  A.  **I would say that we became aware of it towards the end of**

20  **2020.**

21  Q.  Okay.  But the indictment was in existence long before

22  that; isn't that correct?

23  A.  **The indictment, no.  Not in the 2018 --**

24  Q.  I'm sorry.  The underlying act was long before that, right?

25  A.  **The underlying act of January 2018.  That's correct.**

1  Q.   And bringing your attention to that act, it involves an

2  allegation that Mr. Miller enrolled and completed a firearms

3  course, right?

4  A.   **Yes, sir.**

5  Q.   All right.  And during that course you are alleging that

6  he, at least at some point in time, was required to fire a gun

7  as part of the course?

8  A.   **That's correct.**

9  Q.   Do you know if the gun belonged to him or somebody else?

10  A.   **It belonged to the range that hosted that course.**

11  Q.   All right.  So it wasn't like his to take home or anything

12  like that.  It was something that was just for use during the

13  course?

14  A.   **That's correct.**

15  Q.   All right.  And in fact, after that as the proffer stated,

16  there's an allegation that Mr. Miller attempted to obtain a

17  concealed carry permit from the State of Florida, right?

18  A.   **Yes.**

19  Q.   And he was unsuccessful in doing that?

20  A.   **Correct.  They denied his application on the grounds of his**

21  **felony convictions.**

22  Q.   All right.  So you are unaware of any time where he

23  actually ever received a concealed carry permit?

24  A.   **No.  The application was denied by the state.**

25  Q.   Okay.  And with regard to the new charges that are filed

1  that relate to the arrest and service of the search warrant

2  last week, in those charges it is alleged that there's two

3  allegations; one is that Mr. Miller possessed ammunition and

4  one is that he possessed a short-barreled rifle, correct?

5  A.  **That's correct, sir.**

6  Q.  All right.  Now, as far as the rifle is concerned, when the

7  actual physical items that were seized were parts of a gun,

8  right?  They were not assembled as a gun; is that correct?

9  A.  **Yeah.  The gun was in basically two parts; an upper and a**

10  **lower.**

11  Q.  Okay.  And so the upper and lower receiver; is that

12  correct?

13  A.  **Yes.**

14  Q.  All right.  But were both of those parts present, the upper

15  and lower?

16  A.  **Yes, sir.  Together located with a magazine.**

17  Q.  Okay.  But they were not connected to one another?

18  A.  **No.**

19  Q.  All right.

20  A.  **Connected to the upper, no.**

21  Q.  And the lower receiver is the part that typically has the

22  trigger mechanism and, then, the upper receiver is the part

23  where the round is chambered; is that correct?

24  A.  **Correct.  Yes, the lower receiver would be the trigger**

25  **mechanism and the upper would have the barrel where the round**

1  would be spent from.

2  Q.   And was the barrel actually attached to the upper receiver?

3  A.   **So I'm not a firearms expert, but typically those upper**

4  **receivers, the barrel, it is all incorporated into one, one**

5  **piece.**

6  Q.   Okay.  And were you the agent that took the sworn statement

7  or the post Miranda statement from Mr. Miller?

8  A.   **I was, yes.**

9  Q.   All right.  And during that time, as the proffer mentioned,

10  did he express some disbelief or some surprise that he could be

11  charged with a crime based on what he was doing?

12  A.   **He did, in reference to the 2018.**

13  Q.   Okay.  And did he indicate that he was uncertain as to the

14  legality of whether that was illegal or legal?

15  A.   **He made reference to the fact that he was not an expert on**

16  **the law and because Florida was a different state that somehow**

17  **that would impact his eligibility to acquire and possess**

18  **firearms.**

19  Q.   Okay.  And the offenses that were his prior felonies from

20  New Jersey were things that happened back in 2006 and 2007;

21  isn't that correct?

22  A.   **I believe that's accurate.**

23  Q.   That would have been roughly 14 years ago, right?

24  A.   **Correct.**

25  Q.   All right.  And do you know how old Mr. Miller was at the

 1  time that those offenses happened?

 2  A.  **I believe he was somewhere around 17, 18.**

 3  Q.  Okay.

 4  A.  **I think he was essentially a minor during some of those and**

 5  **then sentenced as an adult, but I'm not a hundred percent**

 6  **exact.  I would have to look at the sheets to --**

 7  Q.  But he was a teenager at the time, late teens, right?

 8  A.  **Late teens, I believe.**

 9  Q.  But not yet reached the age of 20, right?

10  A.  **Again, I would have to look at the exact dates, but that**

11  **sounds accurate to my knowledge.**

12          MR. CORMICAN:  Okay.  If I could have one moment,

13  Judge.

14  BY MR. CORMICAN:

15  Q.  There was one other thing that was referenced during the

16  proffer about something in early February of this year at a gun

17  shop in Davie where the proffer indicated that Mr. Miller was

18  present there with another person and that other person

19  purchased some parts to a gun; is that right?

20  A.  **That's correct.**

21  Q.  All right.  So Mr. Miller didn't actually purchase anything

22  there?

23  A.  **We're still investigating that, but it appears that Mr.**

24  **Miller may have also purchased some parts that day as well in**

25  **addition to person number one.**

1  Q.   Okay.  So that would be inconsistent with what was

2  proffered earlier, right?

3  A.   **I would say it's consistent with person number one**

4  **purchasing the firearms.**

5  Q.   But person number one is not Mr. Miller, right?

6  A.   **Correct.**

7  Q.   Okay.  Do you know who person number one is?

8  A.   **I do know, yes.**

9  Q.   Do you know if he is a relative of Mr. Miller?

10 A.   **I know who the person is.**

11       MR. CORMICAN:  All right.  I don't have anything

12 further, Your Honor.

13       THE COURT:  Any redirect?

14       MR. BHAT:  Yes, briefly, Your Honor.

15                    REDIRECT EXAMINATION

16 BY MR. BHAT:

17 Q.   Special Agent Gregory, you were asked questions about

18 whether or not any Omegle videos had depicted violence.

19      Do you remember that?

20 A.   **Yes.**

21 Q.   In the Omegle videos that were mentioned in the proffer,

22 how did the videos who were subject to the statements and the

23 actions of Mr. Miller, react typically?

24 A.   **Typically the reactions would range from poor and fright,**

25 **you know, fear for their lives.  In some instances to utter**

1  **disbelief.  Some of them left at a loss for words.**

2  Q.   Okay.  And did many of those videos include what appeared

3  to be weapons, regardless of whether or not there were actually

4  weapons?

5  A.   **Correct.**

6  Q.   Okay.  And is Omegle an Internet platform that is

7  accessible all over the world, to your knowledge, or in large

8  portions of the world where the Internet is present?

9  A.   **To my knowledge, yes.**

10 Q.   And to your knowledge, is the interstate transmission of

11 threats to injure, or intimidate, or rather interstate threats

12 to injure specifically a separate federal offense regardless of

13 whether or not an actual act of violence occurred?

14 A.   **That is correct.**

15 Q.   And are all of those threats still under investigation by

16 the federal Government vis-à-vis Mr. Miller?

17 A.   **That is correct.**

18 Q.   Okay.  Do you recall some questions about Vice President

19 Elect Harris at the time and President Elect Biden at the time,

20 correct?

21 A.   **Yes, sir.**

22 Q.   Did Project Mayhem limit itself exclusively to public

23 figures, such as President Elect Biden and Vice President Elect

24 Harris?

25 A.   **No, they did not.**

1      While I am not aware of every single target of Project

2  Mayhem, other victims, if you want to call them that, were

3  other people Mr. Miller perceived to have grievances with or

4  rivalries with other Internet personalities in some of the

5  instances.

6  Q.   And in the proffer you recall the statement regarding a

7  victim whose father's phone number and their own phone number,

8  and various social media accounts that were posted on-line.

9      That was a private citizen, right?

10 A.   Yes, sir.

11 Q.   Okay.  Now, in fact, Mr. Miller did have some videos that

12 appeared to depict in-person interactions with individuals,

13 right?

14 A.   That's accurate, yes.

15 Q.   Those are the interactions that were described in the

16 proffer as the N word encounters?

17 A.   Correct.

18 Q.   And how do you know that Mr. Miller appeared to actually be

19 interacting in person with the typically African-American

20 individuals that were filmed and then posted the channel as

21 part of this series?

22 A.   Right.  While you don't see Mr. Miller's face, his voice is

23 clearly recognizable.

24      And having watched numerous amounts of his videos and spent

25 a considerable amount of time with Mr. Miller last week, I did

1  **recognize his voice.**

2  Q.   Okay.  Now, moving on to the short-barreled rifle that was

3  discovered in the home, did you speak with an expert or an

4  individual who has significant experience in assessing and

5  evaluating firearms prior to your testimony here today?

6  A.   **I did, yes.**

7  Q.   And what was that person's view as to whether the parts

8  that were found in one place in the dryer could be assembled

9  into a short-barreled rifle?

10 A.   **In my conversations with that expert, you know, they kind**

11 **of relayed to me that those two parts could be assembled in a**

12 **very quick fashion to create a functioning firearm.**

13 Q.   Okay.  And are you aware of what a short-barreled rifle is

14 generally?

15 A.   **Generally a short-barreled rifle would be considered a**

16 **rifle under 16, or 16.5 inches in length, the barrel.**

17 Q.   And in your experience and training, is that sort of rifle

18 the shorter barreled than 16 inches particularly dangerous?

19 A.   **It is dangerous from a concealability standpoint, yes.**

20 Q.   Okay.  And is it the sort of weapon, to your knowledge,

21 that the ATF requires individuals who possess that weapon to

22 register?

23 A.   **Absolutely.**

24 Q.   And is that a result of the danger that is posed by the

25 concealment of those sorts of weapons and the harm that they

1  can do if used?

2  A.  **Absolutely.**

3         MR. BHAT:  Okay.  No further questions, Your Honor,

4  and I'm ready to proceed to argument.

5         MR. CORMICAN:  Judge, may I just briefly recross just

6  based on the additional redirect?

7         THE COURT:  Just briefly based on additional

8  questioning and then I have a question or two.

9          Go ahead.

10        MR. CORMICAN:  I will be very brief, Your Honor.

11  Thank you.

12                      RECROSS EXAMINATION

13  BY MR. CORMICAN:

14  Q.  You indicated on redirect that there was a private citizen

15  who was the subject of harassment by Mr. Miller's followers; is

16  that correct?

17  A.  **That's correct, sir.**

18  Q.  Was it ever relayed to you why that person was being

19  targeted?

20  A.  **Based off some of the posts I've seen, it appears that this**

21  **individual and Mr. Miller may have had some previous**

22  **altercation.**

23      **Though, all the details surrounding that I do not have, but**

24  **it sounds like they had come into some -- had a preexisting**

25  **altercation with each other that may have led to that incident.**

1  Q.   Were you ever made aware that that individual had

2  threatened Mr. Miller, or his family, or allegations to that

3  effect?

4  A.   **I am not aware of that.  No, sir.**

5  Q.   On the redirect you were also asked about in-person

6  interactions that were filmed.

7      Again, during those interactions were there ever actually

8  any physical contact with the people as in violence or touching

9  one another?

10  A.   **No.**

11  Q.   All right.  And were those mostly done by driving by or

12  from like shouting things from a vehicle?  Is that the way

13  those were typically done?

14  A.   **It depended.  The videos varied.**

15      **Some of them involved Mr. Miller, you know, pursuing people**

16  **in a parking lot on foot as the victim was trying to walk away.**

17      **Some of them, you know, Mr. Miller is in a vehicle.  Others**

18  **Mr. Miller is standing in a parking lot shouting, you know,**

19  **from some distance away.  So it varies, sir.**

20  Q.   He would be shouting some kind of insulting or provocative

21  thing at somebody to elicit a response from them; is that

22  right?

23  A.   **Yeah, that's accurate.**

24          MR. CORMICAN:  All right.  Nothing further, Your

25  Honor.

1     THE COURT:  I want to ask you two questions, Agent.

2     THE WITNESS:  Yes, sir.

3     THE COURT:  Well, first of all, tell me again, Omegle

4  is a platform where people are randomly connected.  So people

5  can randomly connect with somebody who they didn't necessarily

6  ask for, but they can leave whenever they want to, right?

7     THE WITNESS:  That's correct.

8     THE COURT:  The in-person stuff -- well, actually,

9  everything taken together, including on the main platform, you

10 were asked on redirect, I guess, about whether that can

11 constitute a federal offense by communicating a threat through

12 the Internet.

13     Are you investigating that and putting together

14 possibly a federal charge for interstate communication of

15 threats over the Internet?

16     THE WITNESS:  Yes, sir.  That investigation is

17 ongoing.

18     THE COURT:  Do you believe you have enough to charge

19 him with that based on what you have already told me about

20 today?

21     THE WITNESS:  I believe I have potentially identified

22 a victim that as part of our investigation, we plan on

23 interviewing.  And then, from there, we will determine the

24 course that investigation will take and if those charges will

25 be pursued.

1          THE COURT:  And I'm looking at my notes from the live

2    -- I guess, what do you call them, encounters that you referred

3    to harassment.

4          You just told Mr. Cormican that there was no actual

5    physical contact, but it looks on one of them, correct me if

6    I'm wrong, that the Defendant approached someone, a black man

7    in a parking lot and actually threatened to beat him.

8          Tell me about that one.

9          THE WITNESS:  Yes, sir.

10         So the video starts off.  There is no sort of

11   pre-context as to how that interaction started.  The video

12   starts while the interaction is already occurring.

13         Mr. Miller, as well as some other unidentified person

14   off camera, who I don't -- I have not identified who that

15   individual is -- can be heard hurling racial slurs and insults

16   and threats of violence specifically to beat the man in the

17   parking lot.

18         The individual tries to walk away.  He stops and says

19   something to him and it's a little difficult to understand what

20   the man is saying to them.

21         They continue to advance towards that individual.  And

22   that individual ultimately can be seen kind of walking out of

23   the parking lot away from Mr. Miller and the other unidentified

24   individual with him.

25         THE COURT:  It was Mr. Miller and another person there

1  and Mr. Miller talking?

2          THE WITNESS:  That's what it sounds like.

3          At the very end of the video, you can only make out a

4  leg of someone.  You can't see anyone's face, but it appears

5  that there is another individual there with Mr. Miller also

6  hurling insults at this individual.

7          THE COURT:  And Mr. Miller was physically present in

8  close proximity, close enough that he could have carried out

9  the threat and he physically threatened to beat the man?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  All right.  Does that conclude your

12 presentation?

13         MR. BHAT:  From the Government, yes, Your Honor.

14         THE COURT:  All right.  From the Defense, do you have

15 any evidence, testimony, or proffer, including letting me know

16 if everything in the Pretrial Services Report is accurate?

17         MR. KENT:  I can supplement certain information, Your

18 Honor, that has not come to the attention of the Court yet,

19 which is that in my conversations with the Defendant's father,

20 he says he owns property in New Jersey.  And that he could

21 potentially put up that house as collateral in the form of a

22 corporate surety.

23         The Government, when I mentioned this to the U.S.

24 Attorney, said they were asking for pretrial detention.  So

25 they were not even satisfied with a corporate surety.

1        What I would like to do, if it is permissible, is

2   since the nature of the Zoom hearing is such that I can't

3   consult with co-counsel during the course of the hearing, or

4   the cross-examination, or exchange notes, is maybe supplement

5   something he says after he makes his closing and if it helps

6   the Court in making its decision.

7        THE COURT:  I asked if you have to present any

8   evidence and that's Mr. Cormican and/or Mr. Kent.  I'm not

9   going to allow both sides to make argument and then I rule and

10  then you supplement.  I mean, if you have anything you want to

11  present, now is the time.  If you need to talk privately for a

12  minute --

13       MR. KENT:  Can we have five minutes in a breakout room

14  just to -- I won't take a lot of the Court's time.

15       THE COURT:  With your client there as well or no?

16       MR. KENT:  No, I don't need my client.  I just need

17  Russell and I to be able to go to a breakout room for one

18  moment.

19       THE COURT:  Five minutes.

20       MR. KENT:  I won't even take that.  Just tell me how

21  to do the breakout room.

22       THE COURT:  I'm going to assign you and then come back

23  when you are ready.

24       MR. KENT:  Okay.

25       THE COURT:  It's 2:22.  I expect you back at 2:27.

1        MR. KENT:  You got it.

2        THE COURT:  All right.  So we will be in recess for

3   five minutes.

4        MR. CORMICAN:  Thank you, Your Honor.

5   (Breakout room; off the record).

6        THE COURT:  I'm back.  Is everyone here?

7        MR. CORMICAN:  Yes, Your Honor.

8        MR. KENT:  Yes, Your Honor.

9        MR. BHAT:  Yes, Your Honor.

10       THE COURT:  Let me close the breakout room.

11       MR. KENT:  To be crippled, but I'm here, Your Honor.

12       THE COURT:  All right.  Where were we?

13       MR. BHAT:  Argument, Your Honor.

14       THE COURT:  All right.  Go ahead, Mr. Bhat.

15       MR. BHAT:  Sure.  Your Honor, I will take the 3142(g)

16   factors in turn first and nature and circumstances of the

17   offense charged.

18       THE COURT:  Mr. Bhat, I'm going to allow you to say

19   whatever you want, but let me kind of cut to the chase on some

20   things.

21       MR. BHAT:  Sure.

22       THE COURT:  I don't know that you have presented any

23   reason for me to think that he is a risk of flight.

24        I think what we're talking about is either he is a

25   generalized danger to the community or danger to other people.

1   You have convinced me that he has done some horrible things,

2   but it almost feels like this was a detention hearing for

3   someone who has been charged with interstate transmission of

4   threats.  When it is actually a detention hearing for somebody

5   who is charged with possession of a firearm once three years

6   ago and once upon his arrest.

7          And I think you talked earlier about the possibility

8   that he is a serious risk to witnesses.  And I don't know that

9   he is a serious risk to any witnesses for the offense for which

10  he is charged.

11         Now I frequently have cases where there are threats to

12  the president, for example, and I am asking questions about if

13  there is any indication that he is going to follow through with

14  it, et cetera, but he is not charged with that.

15         And so I guess I want you to address -- unless there

16  is something that I'm missing about risk of flight, I want you

17  to concentrate on danger to the community in general and

18  specific people.  So highlight why you think certain people are

19  in danger.

20         And if you've got an ongoing investigation where

21  you're about to drop another complaint where he's charged with

22  multiple counts of an interstate transmission offense, tell me

23  that.  Otherwise, focus on what is a legitimate threat and what

24  is presumptively protected speech.

25         MR. BHAT:  Sure, Your Honor.

1        So let me first address the threats issue.  The

2   Government is conducting an ongoing investigation into these

3   threats.  The Government has sort of started examining the

4   feasibility of the threats charged with respect to the

5   interstate threats to injure that were issued by Mr. Miller

6   over Omegle, which is a global platform.

7        And so, the Government is anticipating potentially

8   charging Mr. Miller with those threats and the Government is

9   seeking charges against Mr. Miller with those threats in the

10  near term.  It simply has not happened yet.

11       And so, as Your Honor mentioned, the charge counts

12  have to do with the firearms and the firearms are dangerous

13  because of the overall context of Mr. Miller's statements.  So,

14  you know, the fact that Mr. Miller had a short-barreled rifle

15  that could easily be concealed in his dryer, it is very

16  important.

17       And I would like to point the Court to *United States*

18  *v. Kent,* which is 175 F.3rd 870.

19       MR. KENT:  What?

20       MR. BHAT:  At 871 to 874.

21       I hope it is not Mr. Norman Kent.  I don't think it

22  is.  But in that case, authorities found a lower receiver and a

23  short-barreled upper receiver for an AR-15 style rifle in

24  different locations disassembled within a small apartment.

25       And the issue presented for the Eleventh Circuit in

1  that binding decision is whether the Defendant's possession of

2  those independent pieces in different places in his apartment

3  constituted possession of a National Firearms actual barrel

4  rifle.

5      And the Court held that, in fact, it did because,

6  quote, the short-barreled upper receiver unit and the, quote,

7  AR-15 lower receiver unit were located in the same small

8  apartment and could be connected so quickly and easily creating

9  an operable short-barreled rifle with only a minimum of effort.

10      So the Government is arguing in this case that the

11  possession of that very dangerous National Firearms Act rifle

12  in conjunction with some of the statements that Mr. Miller

13  made, in conjunction with Mr. Miller's physical -- apparently,

14  physical threats towards a specific individual in close

15  proximity on his Telegram channel posted to 45,000 people.

16      That's really sort of the basis for the detention and

17  it is also the basis for probable cause on the new charges with

18  respect to the short-barreled firearm.

19      The categories of guns that are mentioned in the

20  National Firearms Act, they are of a different class of

21  dangerousness than a typical handgun.  And the context in which

22  Mr. Miller possessed the short-barreled rifle in this case, as

23  well as the hundreds of rounds of ammunition that were

24  discovered in his home is really important.

25      So in 2018, he possessed a firearm while taking a

1 training to get a concealed carry permit, which kind of

2 suggests his desire and his fascination with firearms to get a

3 firearm.

4        He was willing to perjure himself by claiming that he

5 was not a felon in order to get that concealed carry permit.

6 And he, apparently, did not feel that the offense was really

7 that serious because he expressed disbelief during his post

8 Miranda statement that he could be arrested over something like

9 that.  Even though he acknowledged being a convicted felon.

10        And then, after acknowledging that he had received a

11 notification from Florida authorities that he had been denied a

12 concealed carry permit because of his felony convictions, then,

13 only then afterwards, does he go and purchase the parts for a

14 NFA firearm and hundreds of rounds of ammunition, which the gun

15 itself didn't have any serial numbers and no manufactured

16 markings.

17        He, himself, said that he was planning to assemble the

18 parts for a coming civil war.  And he has demonstrated through

19 his Internet channel that he is actually willing to go out in

20 public and to make these threats.  So he's on precipice, Your

21 Honor.

22        You know, during the testimony so far, you have heard

23 that he has not done anything and I think the operative word is

24 yet.  He has not done anything yet.  He has crossed right over

25 the line of going from the digital world to the in-person

1  world.

2      He has not actually used the weapons that he had in

3  his possession unlawfully yet.  But the fact that he had them,

4  the fact that he was willing to obtain them after being denied

5  a concealed carry permit and being advised of his felony

6  status.  The fact that he believes that a civil war is coming

7  and he said so repeatedly.

8      And the fact of the nature of the content of this

9  channel to suggest that, in fact, these threats are not just

10  sort of random threats against individual people that they, in

11  fact, could be real.  And he did, in fact, go and harass

12  individuals in real life.

13      The firearms possessions are repeated over the course

14  of years despite knowledge of prior felony convictions.  And

15  the more recent possession was in the context of consistent

16  threats that he had issued over the Internet.

17      With respect to risk of flight, Your Honor, I think

18  the Government's issue, primarily with risk of flight, is

19  Mr. Miller is facing significant exposure in this case.  His

20  guidelines are three to four years in prison.  He has never

21  faced federal charges.  He is now facing multiple federal

22  charges.

23      There is a 30-year statutory maximum on all the

24  charges that he is faced with.  That's substantially more than

25  anything he has ever faced.  And further compounding the flight

1  risk, Your Honor, is the weight of the evidence in this case.

2  There are photographs of the firearms both that he used in 2018

3  and that were recovered from his home.

4       Mr. Miller's video recorded post Miranda admissions as

5  described in the proffer in which he admits his knowing

6  possession of all these firearms.  The paperwork that was found

7  in the home demonstrating Mr. Miller's knowledge of his prior

8  felony convictions.  Paperwork demonstrating the actual felony

9  convictions themselves, which were booked in law enforcement's

10  possession and found in the home.

11       Mr. Miller's admissions also included his

12  acknowledgment of the specific facts underlying one of his

13  felony connections.  The history and characteristics of the

14  person also is sort of one of the things that all of these

15  videos wear on for Your Honor.

16       The Pretrial Services Report indicates that Mr. Miller

17  has only been in is this community for five months.  That

18  increases the flight risk.  He has resided in South Florida for

19  five months and he has used it as a base of operation for this

20  on-line threat video show that he has.

21       He also made the statement during his post Miranda

22  interview that he made firearms purchases in Florida in part

23  under a belief that Florida was more permissive of this sort of

24  thing than in New Jersey.

25       So it almost appears as though he has come to Florida

1  for the purpose of obtaining weapons or for the purpose of

2  living in what he perceives to be an environment that is more

3  permissive to the sort of mayhem that he frequently foments

4  on-line.

5          He has one sibling in South Florida, but the vast

6  majority of his family do live in New Jersey.  He has a fiancee

7  in Colorado.  And he admits that he has no employment other

8  than the monetization of the videos that, including the threat

9  videos that are part of the basis for the Government's

10  detention.

11          The Defendant, also per the Pretrial Services Report,

12  has challenges associated with mental health and substance

13  abuse.  In fact, it appeared yesterday night he had something

14  of an anxiety attack.  He has expressed that he has extreme

15  depression and extreme anxiety.  That he is a routine marijuana

16  smoker and he smokes daily up until his arrest.

17          That should give the Court pause as well given that he

18  sort of seems predisposed to making these sorts of threats that

19  he is making.  Predisposed to having weapons, buying weapons,

20  building weapons, and he is also suffering from these mental

21  health issues, which could potentially reflect on the

22  possibility of him going that extra step.

23          And just to get into the multiple prior felony

24  convictions, Your Honor, they are from his teenage years, but

25  there is an aggravated assault charge involving his

1    indiscriminate firing of a pellet gun out of a window one of

2    which hit a man.

3           So if Your Honor reads that in context with the guns

4    in this case, there's a real risk there that he has access,

5    clearly, to firearms.  And someone under the most stringent

6    conditions of bond could ostensibly bring him a firearm.

7           He has gone to firearm ranges with an individual who

8    purchased firearm parts in the past.  And he has drug

9    distribution convictions as well from a while ago, but those

10   convictions are serious convictions.  And Mr. Miller seems to

11   not think of them as a big deal.  In fact, he said he thought

12   that they were expunged even though he hadn't taken any steps

13   at all to expunge them.

14          The Pretrial Services Report also reflects arrests for

15   drug possession and for possession of prohibited weapons more

16   recently.  And importantly, Mr. Miller's on-line statements

17   give the Government profound concerns that of his character and

18   his mental condition and about his ability to suppress acting

19   on the thoughts that perhaps brought about what he describes as

20   his extreme anxiety and depression.

21          So even if Mr. Miller were to claim that his on-line

22   videos were mere puffery, expression of free speech, they

23   reinforce for the purposes of detention for the Court that he

24   appears to be a profoundly unstable individual prone to extreme

25   outbursts against specific people in which the goal appears at

1  least in part to generate fear for the entertainment of a

2  follower base and, you know, kind of extended to in-person

3  encounters.

4          And out of the appearance from the videos, Mr. Miller

5  appears to view specific members of large groups of Americans,

6  African Americans, gay individuals, Jewish Americans,

7  transgender Americans as enemies.  And he has no problem, as is

8  shown by his Project Mayhem incident victimizing people who he

9  perceives as his enemies.

10          And so, in that context, the specific individuals who

11  are witnesses in this case who will be identified to the

12  Defense during discovery, there is no promising that Mr. Miller

13  won't use his Internet following, his substantial Internet

14  following to harass, to intimidate, to threaten and potentially

15  to injure individuals who he perceives as potentially

16  testifying against him in the trial.

17          And as to the nature and seriousness of the danger in

18  this case and what would be sort of wrought upon the community

19  if he is released, the Government's request today is really

20  based on the totality of the circumstances and the gaps that

21  are inherent on supervision of even the most stringent

22  conditions of bond.

23          So the request is not just about his possession of

24  dangerous ammunition and an NFA firearm last week, his evident

25  fascination with firearms and ammunition, his willingness to

1  seek out those items and to downplay the seriousness of

2  offenses involving his possession of those items.

3          It is not just about his proclivity for on-line and

4  in-person threats.  Including threats of extreme violence;

5  scalping people, tying people to a pole, shooting them, lining

6  them up against a wall and shooting them.  And those are

7  threats that he made to specific people and specific groups

8  that he perceives as enemies.

9          The Government's request is not just about his

10  willingness to mobilize his large Internet following to attack

11  specific people.  Like the victim -- there was the victim of

12  the Project Mayhem campaign in which he posted publically

13  available information about that person through the Internet

14  with the express intent of having his followers harass that

15  person.

16          Some of whom, and potentially Mr. Miller did, leaving

17  the name:  Paul Miller sends his regards or calling him and

18  claiming to being Paul.  And it is not just about his illusions

19  to the strength of that following.

20          So in the context of trying to dissuade the FBI from

21  coming to his house, he posted a video to Telegram in which he

22  said the FBI coming for him was going to radicalize a lot of

23  people.  He told agents during his post Miranda statement that

24  it was going to be really wild when people found out about,

25  quote unquote, this which it appeared from context that he's

 1  referring to his arrest and charges and then he said he has

 2  45,000 followers.

 3         So, you know, the Government believes that with all

 4  the evidence that has been proffered with his references

 5  repeatedly to a civil war that is coming and his shallow ties

 6  to the community, all of those things taken together are the

 7  basis for the request.

 8         And he has got a large on-line following and he's got

 9  a worldwide following.  And he could theoretically leverage

10  that following to flee in the event that he feels that he is

11  subject to a substantial amount of time in prison, or in the

12  event that he feels that the weight of the evidence against him

13  is very strong.  He has got a following of 45,000 people on a

14  global social media platform that he has shown is willing to

15  leverage in a variety of different ways to benefit himself.

16         So, again, the Government's position in this case, it

17  is all about the totality of the circumstances.  It is not just

18  about his possession to guns, but it is really about the

19  context in which he possessed the guns.  And the context in

20  which he made the statements on-line and the context to which

21  he made in-person threats to specific individuals, it gives the

22  Government deep, deep pause that releasing him into the

23  community would be anything but a massive danger that would not

24  be curable by any conditions of bond.

25         THE COURT:  All right.  Thank you.

1          Mr. Cormican or Mr. Kent.

2          MR. CORMICAN:  Thank you, Your Honor.

3          I think the Court said something very pressing before

4   about the statement by AUSA Mr. Bhat.  To me it looks like the

5   Government's argument in this case is more about Mr. Miller's

6   Internet channel and views that he expresses there than the

7   underlying criminal charge that he is facing.

8          What I think is clear is that Mr. Miller operates an

9   Internet broadcasting show, for lack of a better word, that is

10  based on him expressing repugnant views.  Things that are

11  obviously have no place in descent society, but they are

12  presented to shock the audience and they attract an audience.

13         You know, the proof is in the pudding.  He's got tens

14  of thousands of people that watch these things and find them

15  entertaining and there is a long history of people doing that

16  type of thing.

17         I mean, last year one of the biggest films that was

18  released was Sacha Baron Cohen's *Borat*.  And the whole premise

19  of *Borat* is he is an assumed character that goes out in public

20  and says racially and insensitive things and sexist things and

21  homophobic things and they film the way people react to it.

22         THE COURT:  Sacha Baron Cohen didn't then go and build

23  his own concealable firearm that is prohibited under Title 26.

24         So I told Mr. Bhat what I wanted him to address.  That

25  is what I want you to address.  If I were willing to go along

 1  with down the route that I think you're going where he is a

 2  small time *Borat* and he was just after reactions, well, Mr.

 3  Bhat is right.  I do have to take the context.

 4       That is the context, but didn't he then knowing that

 5  he was not allowed to have a firearm, try to get a concealed

 6  weapon permit and when he was denied that, go out and

 7  manufacture one that is untraceable.

 8       And you know, I take Title 26 very serious.  Like the

 9  weapons that are on the list of Title 26 are weapons that are

10  really only meant to cause harm to other people.  It is

11  silencers.  It is pipe bombs.  It is machine guns and it is

12  short-barreled guns, which are meant to be concealed and cause

13  maximum damage to the people who they are aimed at.

14       So I am with you up to a point on saying provocative

15  things so that you can get an audience, but explain to me why

16  it is then okay for a person who is willing to do all those

17  horrible things.

18       Including publically accosting people and harassing

19  them and saying terrible things to them, and doing things that

20  will provoke a lot of people to start a fight or worse into

21  that context with somebody who builds his own short-barreled

22  gun.  That's what I want you to address.

23       MR. CORMICAN:  And again, we're at the very outset of

24  the case and I haven't had the opportunity to fully examine the

25  evidence that supports these allegations.  They are allegations

1  at this point, but I think if you look at them on the broad

2  spectrum of allegations related to felons with firearms, they

3  slide towards the end of the lesser rather than the greater.

4       The allegations are essentially in 2018 that Mr.

5  Miller signed up and took a class on firearms.  During the

6  course of that class, he discharged a firearm that did not

7  belong to him that was property of the person giving the class.

8  He did not ever take it home, or possess it, or carry it

9  around, or put it in his car, or put it in his waist.

10      Then, he applied for a concealed weapons permit and it

11 was denied.  That is the allegation for the 2018 indictment.

12 The recent allegations are that no completely assembled firearm

13 was found.  They found parts to a firearm.  The post Miranda

14 statements that were referenced indicated that potentially that

15 firearm may never have even actually worked.

16      It seems to be that there were statements that it

17 didn't and then maybe it did at some point.  At the time it was

18 found, it was certainly not in operational shape.  And there

19 were statements that he gave that he had been threatened by

20 various people based on these, you know, this controversial

21 Internet show that he has and he had concern for his personal

22 safety that people may come after him based on that.

23      I think it is also important to keep in mind that the

24 felony charges that are referenced as the foundation for these

25 charges occurred 14 years ago.  And at the time, Mr. Miller was

1 between the ages of 17 and 19 years old.

2        And when he was confronted about this, I think it is

3 understandable that he would express confusion or uncertainty

4 about what those things meant and what actually had occurred.

5 You are talking about a teenager taking a plea on a case

6 14 years ago.

7        So, again, I think there is a lot of road to travel to

8 look at the basis of these charges, but even based on just the

9 allegations as presented, there are questions about them and

10 there are potentially mitigating factors present around them.

11        So in addressing the actual charges that we are here

12 to talk about, rather than the extreme entertainment on-line in

13 the television show or Internet show that he broadcast, which

14 seems to be a whole lot of what the Government was talking

15 about in their presentation.

16        I think a lot of that would gravitate towards pretrial

17 release.  These being very old felony charges.  The guns being,

18 you know, one gun being unassembled and the other one not even

19 being given to him other than to fire in a class.  And you

20 know, based on his own confusion about his prior record .

21        So I think that to answer the Court's concern, I think

22 that, you know, if we're going to just look at the allegations,

23 which is what I think we should do.  I think even if a person

24 has offensive, or repugnant political, or social views, they

25 should be treated equally as everyone else when it comes to

1  these kind of offenses.  And I agree what was said in those

2  shows are despicable, but they are protected by the First

3  Amendment.

4      And I think they are being mischaracterized as being

5  credible threats to other people when I think the evidence is

6  that there has never been any violence.  That these things are

7  being presented to get a reaction out of somebody so people

8  will watch his show and then they will buy his merchandise and

9  then he can support himself.  Because the evidence presented is

10 that is his sole means of supporting himself is this

11 entertainment.

12     THE COURT:  What about approaching a black man in a

13 parking lot and threatening to beat him?

14     MR. CORMICAN:  Well, I have not actually seen that

15 clip.  So I can't really comment on it exactly, but I think

16 what was important is that there was no physical confrontation.

17     In fact, I don't think the Government has been able to

18 point to a single incidence of physical violence.  I mean, the

19 only way you can do that is you have to go all the way back to

20 when he was 17 in 2007 and there was an allegation that he shot

21 a B-B gun at somebody.

22     THE COURT:  I am not going to detain him because he

23 shot a B-B gun at 17.  If I am going to detain him is because

24 of the context that Mr. Bhat has presented, which escalates to

25 the point where there might not have been a physical

1  confrontation, but there sure maybe could have been.  If he's

2  physically approaching people in the parking lot and

3  threatening to beat them and saying things that are designed to

4  provoke a confrontation.

5          And if I add into that the fact that, you know, you

6  say it was in two parts, I'm with you on that.  But it seems to

7  me the post arrest statement was that at some point it was

8  assembled and fired and it worked.

9          And also, what I am hearing for the first time today

10  is when they went to arrest him, he came out and said -- and

11  then went back in for a while.  And then, he came back out and

12  then they find it disassembled, a homemade firearm, hidden in

13  the dryer.  If he has it for protection, why is it disassembled

14  and hidden in a dryer?

15          MR. CORMICAN:  Judge, I can't answer to where he keeps

16  these parts of a firearm.  But, you know, I think what that

17  does show is that, you know, he came out and he went back in,

18  but he voluntarily came back out.  And I think it shows that he

19  is, you know, not a flight risk.  That he is willing to

20  cooperate.  He gave a statement to the police.

21          And I think that to address the Court's concerns about

22  his conduct about approaching people in public, I think there

23  are less restrictive means of addressing that through pretrial

24  release.  You know, he could be released on monitoring.  He

25  could be placed on home detention.

1          If there is concerns about his on-line activities with

2    the broadcast of his show, he could have a condition that he

3    has no Internet access.  There are less restrictive ways of

4    dealing with that than pretrial detention.  Particularly at a

5    time when we're still dealing with COVID and trying to keep as

6    many people out of the jail as we can.

7          So based on that, Judge, you know, Norman proffered

8    that he has spoken to Mr. Miller's family.  That they have

9    property that they can put up.  That they are willing to do

10   that.

11         And again, I think it gravitates towards pretrial

12   release because there are less restrictive means to address the

13   concerns that the Government has raised.  So that is what I

14   would request that you consider.

15         THE COURT:  Tell me specifically what less restrictive

16   means you would propose?

17         MR. CORMICAN:  Well, I would --

18         THE COURT:  Not to have any access to the Internet?

19   Is he going to comply with that?

20         MR. CORMICAN:  He has indicated to me that is willing

21   to comply with that.  I have addressed that with him and he

22   said he would comply with that.  And, you know, there's

23   monitoring.

24         If the Government is worried about his whereabouts, or

25   where he might be going, or there is even home detention if

1   there is a concern about who he might be associating with.

2           THE COURT:  I will give you the last word, Mr. Bhat.

3           MR. BHAT:  Your Honor, the conditions of bond would

4   not assure the Government that Mr. Miller is not a danger to

5   the community.

6           If he were to have an ankle monitor, there is always

7   the chance that before Probation is able to realize and to

8   respond to leaving home detention or even is in an unsafe area

9   that he could go and engage in the sort of threats that he has

10  been making to people in person.

11          He has already access to firearms.  He said himself he

12  has been to gun shows.  There are people who have been with him

13  to facilities where guns and gun parts were purchased or he had

14  hundreds of rounds of ammunition in his home.

15          Even if he were not to have access to the Internet,

16  someone could come to his home with a computer and simply type

17  what he dictated to him.  So there are a variety of ways that

18  he could circumvent the conditions of bond.  The risk of that

19  circumvention is enormous because he has a substantial Internet

20  following and that Internet following has shown itself willing

21  to do things on his behalf before.

22          And you know, the Government would not put short of

23  Mr. Miller to order his social media following to intimidate

24  specific witnesses in this case.  So understanding that there

25  is theoretically less restrictive means than pretrial

1   detention, the only way to be certain that Mr. Miller is not

2   going to act on specific threats that he has made in the

3   context of assembling firearms and calling for civil war,

4   making horrific remarks to specific people is to have him

5   detained.

6           And that is why the Government is seeking detention

7   and would not consider the prospect of a corporate surety bond

8   because there is no amount of insurance that the Court would

9   have that he would comply by the terms of that bond and that he

10  would actually refrain from the sorts of things that the

11  Government would fully expect for him to do.

12          THE COURT:  All right.  Let me thank both sides for

13  their presentation on behalf of your respective clients.

14          As a preliminary matter, this is also a preliminary

15  hearing on the new complaint.  I will find that probable cause

16  has been established for the complaint and so I will make a

17  finding on that.

18          You are going to present that to the Grand Jury and

19  they will make a probable cause finding as well, but for the

20  purposes of a preliminary hearing, I find probable cause on the

21  new complaint.

22          You have not convinced me that he is a risk of flight.

23  And although he has limited ties here and he is a U.S. citizen

24  and, you know, the amount of time that he is looking at is not

25  a lot of time compared to most of the cases that I have.

1          When I detain somebody based on a risk of flight, it

2   is because they are looking at the rest of their life in

3   prison.  So I don't have any indication that he is going to

4   flee.  In fact, he may be the exact opposite of someone who

5   would flee from charges like this.  So I am going to find that

6   is not a risk of flight.

7          And that brings us to danger to the community both the

8   serious risk of harm to others, other individuals, and general

9   danger to the community.

10          And I am trying very hard to agree with you, Mr.

11   Cormican, about fashioning some conditions that would make me

12   comfortable that he is not going to be a danger and there are

13   just too many red flags.

14          And again, basically, the way Mr. Bhat phrased it

15   towards the end when I asked you to address the reason for it.

16   And so I am not talking about a pellet gun when he was 17 and

17   I'm not talking about whatever his felony convictions were back

18   then.

19          But I am mostly focused on what has happened in the

20   last several months.  And that is somebody who is a prohibited

21   person who tries to get a firearm and specifically seeks to get

22   a concealed weapons permit and he is denied that.

23          And so even if he was confused initially about why he

24   can't have a concealed weapons permit, my understanding is the

25   State of Florida said because you are a convicted felon.  So he

1  knows he can't have a firearm of any kind.  Especially not a

2  concealed one.

3        And then, into the context of all of these threats,

4  they are more than just a character.  Some of it can be passed

5  off as that, but especially when you get to the point of

6  specific threats to specific people and scalping and killing

7  specific -- approaching people in public and initiating

8  confrontations that, to me, seem designed to provoke a physical

9  confrontation even though one hasn't happened yet.

10        But if you add into that someone who has tried to get

11  a concealed weapons permit and now is making his own weapon and

12  it is an untraceable, concealable weapon designed to cause

13  great harm to others with a short-barrel, that is where I have

14  to draw the line.

15        There are too many red flags that when you add into

16  that a short-barreled rifle, even though it was disassembled

17  based on a post Miranda statement, he was learning the trade

18  and building firearms and he built a firearm.

19        And if I remember right, he said at least once it

20  worked.  That is somebody who is intending, possibly, to use a

21  homemade weapon to carry out some of the threats.

22        I may be wrong and what I'm going to do is, I am going

23  to order him detained based on danger to the community.  If

24  either side comes up with additional evidence, the Government

25  is investigating specific threats and it may be when they

1  investigate them, they will find that they are not real threats

2  or they may find that there is overwhelming additional threats

3  on the Internet.

4          On the other hand, Mr. Cormican or Mr. Kent, or

5  whoever else represents you, Mr. Miller, if you come up with

6  something else that you think might change my mind, I told you

7  before you only get one shot.

8          But in your case I'm telling you if there is something

9  else that we didn't discuss here today that you think might

10  make a difference, file a motion for me to reconsider.  But

11  there are too many red flags for me to feel comfortable setting

12  any conditions that I think will keep the community safe.  And

13  so I will order him detained based on danger to the community.

14          MR. KENT:  Your Honor, I might just ask the

15  Government's assistance in your judicial direction with respect

16  to the incident that the case agent testified to, which alarmed

17  you and which we were alerted to for the first time during this

18  hearing, this alleged encounter with the black man in a parking

19  lot.  That the agent said he has video of it almost in the

20  middle that she just came upon it.  If they have further

21  evidence of that that they could present to us at some point,

22  that would be illustrative and illuminative for the Court, I

23  believe.

24          THE COURT:  I would encourage you to do that, but

25  don't misunderstand me.  I'm not saying there's one thing.

1          It's as Mr. Bhat said, it's the totally of the

2    circumstances.  All of the things that were presented starting

3    with the on-line show, the Omegle, the individual in the

4    parking lot things and then, specifically, in that context

5    bringing in a homemade concealable short-barreled firearm.  All

6    of that is too much for me to allow it.

7          But don't think that you can come back and say, you

8    know, any one thing rests on shaky ground.  And I am not

9    thinking of anything in particular, but I am not resting my

10   decision on one particular thing where you would be able to

11   come back and say they couldn't find the guy from the parking

12   lot.  Therefore, release him.

13         But if you have something to present to me that you

14   think would change my mind, I will be receptive to it.  But

15   from what I heard here today, I am going to order him detained.

16         MR. KENT:  Thank you for the time, Your Honor, in

17   cutting to the chase on the critical issues that this case is

18   going to address.

19         THE COURT:  All right.  Mr. Miller, you are heaving a

20   lot of sighs and raising your hands a lot.  Do you need to say

21   something to me?

22         Keep in mind that while the 30 seconds go by that we

23   are asking you to unmute, I don't think there is anything you

24   are going to say here today that is going to change my mind.

25         You may very well say something that is going to hurt

1  you.  I have represented a lot of defendants for a lot of years

2  and it is almost a bad idea for them to address the Judge or

3  the prosecutor in this situation.

4       That being said, if you want to say something, clear

5  it with your lawyers and then say what you want to say.

6       MR. CORMICAN:  It would be my advice to Mr. Miller not

7  to make a statement at this time and to do so through his

8  attorneys.

9       MR. KENT:  Based on 45 years, Judge, and you being an

10 assistant public defender for many, I echo the advice of my

11 partner.

12      THE COURT:  All right.  So after that 30-second

13 cooling off period, Mr. Miller, three people have now advised

14 you not to say something.  Do you need to talk to your lawyers

15 privately or do you want to say something?

16      THE DEFENDANT:  If I could talk to them privately just

17 for a moment.

18      THE COURT:  All right.

19      THE DEFENDANT:  You know what?  I understand, Your

20 Honor.  I don't want to hold up your time.  You guys are

21 correct.  We can end for today.  I'm sorry.

22      THE COURT:  All right.  I'll get an order out.  I made

23 the finding of probable cause.  Your next appearance is going

24 to be for report re counsel and arraignment on the 24th.

25      Is that all right?

1        MR. CORMICAN:  Yes, sir.

2        THE COURT:  All right.  Court is in recess.  Is there

3  anything else to come before the Court?

4        MR. CORMICAN:  No, Your Honor, thank you.

5        THE COURTROOM DEPUTY:  No, Your Honor.  There is

6  nothing else.

7           (Thereupon, the proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5    accurate transcript of the telephonic audio recorded

6    proceedings in the above-entitled matter.

7

8

9

10   05/19/21                        Bonnie Joy Lewis,
                              Registered Professional Reporter
11                               CASE LAW REPORTING, INC.
                                7001 Southwest 13 Street,
12                             Pembroke Pines, Florida 33023
                                      954-985-8875
13

14

15

16

17

18

19

20

21

22

23

24

25